**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT**

OAK HILL MANAGEMENT, INC.,          :
A Vermont Corporation,              :
                                    :
    Plaintiff,                      :
                                    :
        v.                      :   Case No. 2:20-cv-124
                                    :
EDMUND & WHEELER, INC.,             :
A New Hampshire Corporation,        :
O'TOOLE ENTERPRISES LLC,            :
A New Hampshire                     :
Limited Lability Company,           :
JOHN D. HAMRICK, an individual,     :
And MARY O'TOOLE, an individual,    :
                                    :
    Defendants.                     :
                                    :

**OPINION AND ORDER**

(ECF Nos. 23, 24)

Plaintiff Oak Hill Management, Inc. ("Oak Hill") has brought suit against Defendants alleging fraud, negligence, breach of fiduciary duty, breach of contract, and sale of unregistered securities in connection with Plaintiff's investment in an Ohio property in relation to a Section 1031 exchange. Presently before the Court are two motions to dismiss.

For the reasons set forth below, the motion to dismiss filed by Edmund & Wheeler, Inc. ("E&W") and John Hamrick ("Hamrick") is **denied** (ECF No. 23). The motion to dismiss filed

by Mary O'Toole and O'Toole Enterprises, LLC, is **granted**, and those claims are **dismissed without prejudice** (ECF No. 24).

## I.   FACTUAL BACKGROUND[1]

Plaintiff Oak Hill Management, Inc. ("Oak Hill") is a Vermont corporation owned and operated by Eugina Cuomo Cote and Marc P. Cote (the "Cotes"). The Cotes created Oak Hill after Mrs. Cote received a property called Whitney Village as an inheritance. In the summer of 2018, the Cotes sold Whitney Village, and an attorney suggested that they complete a Section 1031 exchange to defer the taxable gains on the sale. Put simply, a Section 1031 exchange involves a like-kind acquisition of a replacement property to defer taxable gains on the sale of another property. *See* 26 U.S.C. § 1031.

To facilitate its exchange, Oak Hill retained an accountant, a lawyer, and Edmund & Wheeler, Inc. ("E&W").[2] E&W is a New Hampshire corporation with its principal place of business in Franconia, New Hampshire. John D. Hamrick is E&W's Vice

---

[1] Though an Amended Complaint has been filed in this case adding additional charges and parties, the facts as summarized here leave out the added details in the Amended Complaint because Plaintiff has represented that the Amended Complaint does not, and was not intended to, change the claims upon which the motion to dismiss was based. Likewise, Defendants have filed motions to dismiss that only address the newly added counts. ECF No. 44-1 at 4.

[2] The accountant and lawyer have been added as defendants in the Amended Complaint. *See ECF No. 37.* However, they are not named in the briefings relating to this first motion to dismiss.

President and Director, and Mary O'Toole is E&W's President and Operations Manager. E&W purports to be a leading Section 1031 consulting firm.

Because § 1031(a)(3) places some restrictions on the sale timeline and proceeds, property owners often use the services of a qualified intermediary to facilitate the exchange. For this purpose, McLane Middleton, a New Hampshire professional profit corporation, referred Oak Hill to Hamrick. On January 24, 2018, E&W and Oak Hill entered into an Exchange Services & Consulting Agreement (the "Consulting Agreement"),[3] pursuant to which E&W would act as the qualified intermediary in the 1031 Exchange. Section 2.0 of the Consulting Agreement explains that E&W will provide "exchange consulting" which will include, but not be limited to:

1. Overall strategy & education related to Section 1031 replacement property strategies, including:
   a. Whole Ownership of NNN Leased Properties
   b. Fractional Ownership of NNN Leased Properties
   c. Fractional DSTs and "REIT-like" investment opportunities
   d. Oil & Gas (Subsurface Rights)
   e. Conversion of Investment Real Estate to Personal Use Real Estate
2. Introductions to various providers of replacement property options for the purposes of education, product availability, due diligence, etc. Also, the provision of specific information on properties and sponsors that Edmund & Wheeler has worked with extensively.

---

[3] The Consulting Agreement is attached to the Complaint as Exhibit 1.

3. Risk/Reward analysis on replacement property options based on past experience and industry information.
4. Strategy pertaining to the holding entity(ies) of the replacement properties moving forward.
5. Evaluation of various options from the standpoint of:
   a. 1031 applicability and conformance.
   b. Cash flow and NOI analysis.
   c. Leverage, debt and loan package analysis.
   d. Previous experience(s) with providers of such options.
   e. Assistance in reviewing offering packages with review level input.
   f. Previous experience with certain property types and tenants (i.e. CVS, Walgreens, Fresenius Medical, Noah's Event Centers, Tractor Supply, Advanced Auto Parts, BoJangles)

Please note that Edmund & Wheeler, Inc. does not operate in a "Broker Relationship" of any kind with the Exchangor. Edmund & Wheeler, Inc. can derive referral fees from certain providers of replacement real estate, and will disclose those potential fees. Working with these providers can significantly reduce the consulting charges in this Agreement.

Buying certain types of real estate require a thorough review by your attorney, tax and financial advisors. Edmund & Wheeler does not provide legal advice.

Please note that certain replacement options require that the investor be an "accredited" investor, Edmund & Wheeler makes no claim to the Exchangor's suitability for any investment, but will work with Exchangor to determine eligibility.

6. On-Going Section 1031 education to assist in planning for and choosing replacement options, including:
   a. Applicable Section 1031 rules & regulations.
   b. Specific statutory items related to Section 1031.
   c. Identification rules & identification strategy.
   d. Section 1031 standard practices and potential areas of risk.
   e. Safe Harbor analysis for real estate conversion.
   f. Support of tax and legal professionals in the evaluation of potential replacement property options.
   g. Communications with providers of replacement property options on Exchangor's behalf.

  h. Provide references of past exchangors that have
     evaluated and purchased similar replacement property
     options where applicable.

ECF No. 1-1 at 2.

Section 3.0 of the Consulting Agreement explains what E&W
would do under the "exchange facilitation". The facilitation
responsibilities include strategy, support, preparation of
documents, review of "all deeds, offers, contracts, Purchase &
Sale Agreements and other pertinent documents associated with
the Exchange for both Relinquished and Replacement Properties",
coordination and communication with the various professionals,
safeguarding the escrow funds, assistance with time deadlines,
"ensuring all aspects of the Exchange are in strict compliance
with federal tax laws as they pertain to IRC Section 1031", and
more. *Id.* at 3. Page six of the Consulting Agreement contains
the following note: "PLEASE NOTE: Edmund & Wheeler, Inc. does
not provide legal or tax advice during this transaction. As
Exchange Accommodator and Qualified Intermediary, Edmund &
Wheeler, Inc. is not responsible for calculating capital gains
taxes on a state or federal level. You are urged to seek the
services of qualified professionals. We strongly suggest that
you understand your capital gains exposure before, during and
after the exchange." *Id.* at 6. At the bottom of the last page of
the Consulting Agreement, a "REFERRAL FEE DISCLOSURE" warning
states that "Edmund & Wheeler, Inc. could receive financial

consideration for referring clients to real estate brokers or developers offering replacement property options. Edmund & Wheeler, Inc. does not enter in to a Broker relationship with any client. Edmund & Wheeler, Inc. does NOT receive any compensation whatsoever from securities based replacement property options including Delaware Statutory Trusts (DSTs) or subsurface mineral rights." *Id.* at 7.

The Complaint alleges that "[o]nce the Consulting Agreement was executed, E&W proposed and/or analyzed several replacement properties for Oak Hill to purchase in exchange for Whitney Village. Mr. Hamrick's analysis included the risks presented by the tenant in the building to be purchased, the need for due diligence into the building owner and tenant, and inspection of the facilities."

*Maine Property*

Before selling Whitney Village, the Complaint alleges that Oak Hill bought a replacement property in Maine on May 30, 2018. "Mr. Hamrick identified, vetted, and was actively involved in the consummation of the purchase of the Maine Property." He was involved in negotiating the terms of the purchase with the seller, he drafted the letter of intent on behalf of Oak Hill, he included a due diligence period as a condition to the purchase and commented on the due diligence materials, he suggested that Oak Hill receive financial statements and a

business plan for the tenant, and he then told Oak Hill that the numbers were only as good as the stability of the tenant. Additionally, he advised Oak Hill on the requirements of the Section 1031 process.

Then, "[t]o facilitate the reverse exchange, E&W created a special purpose entity, Oak Hill Management SPE, LLC ("SPE"), to "park" the title to the Maine Property until after the Whitney Village transaction closed. After the Whitney Village transaction closed, the SPE would transfer title to the Maine Property to Oak Hill." The SPE, which was controlled and operated by Hamrick, purchased the Maine Property for $4,250,000 and funded this purchase with a $ 2.9 million mortgage and a $1,326,284.50 cash loan payment from Oak Hill. According to the Complaint, Hamrick "repeatedly promised the Cotes that as soon as the Whitney Village sale closed and the sale proceeds from that transaction were transferred to the escrow account, Mr. Hamrick would return to Oak Hill the $1,326,284.50 cash payment Oak Hill made to purchase the Maine Property. Oak Hill understood from Mr. Hamrick that its out-of-pocket cash payment was a loan that would be repaid in full within a short amount of time."

*Whitney Village Sale*

On June 13, 2018, Oak Hill sold Whitney Village to Quinnipiac University for $7,828,639. On July 11, 2018, the SPE

received $4,122,115.26 from Quinnipiac University (after Oak

Hill's mortgage on Whitney Village was paid off).

*Identification Period*

The Complaint alleges that Hamrick told Oak Hill that the

deadline to identify replacement properties was no later than

July 14, 2018 (45 days after Oak Hill closed on the Maine

Property).[4] Before that date, during a meeting between Hamrick

and the Cotes, Hamrick provided false information about two

Aspen Dental property replacement options to discourage the

Cotes from investing in properties that E&W would not receive a

commission on. During that same meeting, Hamrick convinced Oak

Hill to list two tenancy-in-common (TIC) properties as

replacement properties on the 200% Rule Identification Letter.[5]

---

[4] The Court notes that the Complaint also alleges that Hamrick
incorrectly identified this date, and that the clock on the
identification should have been 45 days after the *relinquished*
property was sold. However, Defendants ask the Court to take
judicial notice of IRS Rev. Proc. 2000-37, which provides that a
reverse exchange timeline trigger begins with the purchase of a
replacement property, not the relinquished property. Plaintiff
has no response; however, the point becomes irrelevant where
Plaintiff ultimately did not rely on the date of the
identification period as one of the misstatements made by
Defendants in Plaintiff's response to the motion to dismiss.
[5] 26 C.F.R. 1.1031(k)-1(c) sets out the process by which a party
may identify Section 1031 exchange replacement property before
the end of the identification period. 26 C.F.R. 1.1031(k)-
1(c)(4)(i)(B) explains the 200 percent rule: "Any number of
properties" may be identified as replacement properties "as long
as their aggregate fair market value as of the end of the
identification period does not exceed 200 percent of the
aggregate fair market value of all the relinquished as of the

E&W identified four replacement properties on the 200% Rule Identification Letter on behalf of Oak Hill on July 14, 2018: (a) the Maine Property that Oak Hill had already purchased; (b) the Ohio TIC; (c) the Washington TIC; and (d) a Learning Experience property in Rhode Island. However, "[i]n violation of the Section 1031 requirements, Mr. Hamrick did not identify on the 200% Rule Identification Letter that the Ohio Property is a vacant, undeveloped lot, nor did he describe in as much detail as practical the property improvements to be completed on that lot."

In the summer of 2018, Ms. O'Toole transferred a total of $564,478.87 to Oak Hill. However, Hamrick did not return the remainder of the cash loan, stating that if he transferred the remaining amount that was due and payable, it would become taxable upon receipt. Oak Hill states that, because this was a cash loan and not received from the sale at the heart of the Section 1031 Exchange, this was false. Oak Hill further alleges that Hamrick knew this was false but made this representation so that Oak Hill would be pushed to invest without obtaining debt or a mortgage, which would allow investment in the TICs.

*Ohio TIC*

---

date of the relinquished properties were transferred by the taxpayer (the "200-percent rule")."

Oak Hill explains in its Amended Complaint that, based on the advice of its own attorneys, it moved away from the Learning Experience Property investment. Thus, by August 2018, the only potential replacement property listed on the 200% Rule Identification Letter that would work for the Section 1031 Exchange was the Ohio TIC. The Ohio TIC "involved purchasing interests in a commercial property located at 180 Beaver Creek Circle in Toledo, Ohio. The TIC interests were sold to investors by Rockwell Toledo, LLC and/or Rockwell Debt Free Properties, Inc. (collectively ,"Rockwell")." Rockwell sold TIC interests to investors throughout the country to facilitate the creation of event venues built and operated by Noah Corporation ("Noah"). Noah then rented the event venues. According to the Complaint, "E&W identified the investors to invest in Rockwell/Noah TIC properties and connected those investors with Rockwell/Noah to complete the sale. In return, E&W and/or its officers were paid a commission off the top of the investor's investments in Rockwell/Noah TIC properties."

The Complaint alleges that Hamrick "directly and repeatedly extolled the Ohio TIC investment to Oak Hill in a misleading and false manner." On July 2, 2018, he told the Cotes that they must make an initial investment of at least $1 million – however, he knew (or was reckless in not knowing) that this was false, and other investors had purchased interests for much less. Oak Hill

asserts that Hamrick made this assertion to increase his commission. In fact, Oak Hill alleges that Hamrick's motivation for steering Oak Hill to invest in the Ohio TIC was for O'Toole and himself to receive an undisclosed commission of over 200k. During that same meeting, Hamrick told the Cotes that Noah was very successful, operated premier event centers across the country, and never missed a rent payment. He told them that the TIC was "super low risk" because Noah was responsible for paying all property taxes, maintenance fees, and insurance premiums.

The Complaint alleges that on July 25, 2018, Hamrick provided an approximate annual income of about $250,000 that the Ohio TIC would provide, while in possession of Noah and Rockwell's financials and knowing (or acting recklessly in not knowing) that Noah was suffering financial hardship. The Complaint alleges that "[i]f Oak Hill had known that Noah – the only tenant in the building to be constructed specifically for Noah to occupy and, thus, the only source of the return on its investment – was suffering financial hardship, it would not have purchased about $3.5 million in Ohio TIC interests." Hamrick also represented that he had personally invested in Rockwell/Noah TICs given the reliability and profitability of Noah as a tenant. He said that he "practically owned" the Noah's even venue that Rockwell sold to him in New Hampshire, though he actually only possessed a 4% TIC interest.

11

Additionally, Hamrick told the Cotes that the 12,000 square foot building on the Ohio Property would be completed by no later than January 2019, with Noah renting the space. Hamrick either knew or was reckless in not knowing that this was false. Rockwell purchased the Ohio Property on August 21, 2018. At that time the property was a vacant lot and no building permit had been issued. Noah had never completed any event venue anywhere in the country from the ground up in under six months.

The Complaint also asserts that Hamrick provided Oak Hill with Rockwell's offering Memorandum for the Ohio TIC. The Complaint asserts that the Offering Memorandum contains several misleading points or misrepresentations, such as photographs of an event venue that appears to be near completion but that was not actually located on the Ohio Property. The complaint claims that Hamrick knew or was reckless in not knowing that these representations were false. It also asserts that the Offering Memorandum "did not disclose that Rockwell would pay E&W nor anyone else a substantial commission based on the amount Oak Hill invested in the TIC and that this commission (among others) would be immediately taken off the top of Oak Hill's investment." Hamrick also arranged a conference call on July 31, 2018, at which Rockwell's officer and controlling principal made misrepresentations to Mr. Cote that Hamrick heard while participating in the call but did not correct. Statements

included that Noah was a stable tenant, and that construction of the building would be complete by January 2019 so that the transaction would qualify under 1031's requirements.

Separately, Ms. O'Toole had a telephone conversation with Mr. Cote about him potentially attending a Rockwell open house at a Noah event center in New Hampshire. During the conversation, "Ms. O'Toole spoke very highly of Rockwell and Noah as businesses and represented that investing in a Rockwell/Noah TIC was a great investment" while failing to disclose that she was financially incentivized through commissions.

Mr. Cote made clear to Hamrick in July and August 2018 that "Oak Hill intended to sell Ohio TIC interests not long after purchasing the TIC. Oak Hill made clear that it did not want to keep its interest in the Ohio TIC long term." Hamrick advised Oak Hill then that Ashby would be willing to enter into a buyback agreement. This was extremely important to Oak Hill, "because Oak Hill understood that purchasing the Ohio TIC interests in August 2018 and then selling that interest less than a year later at a reduced price to Rockwell made more economic sense than failing to complete the 1031 Exchange and paying capital gains tax to the IRS." Hamrick knew, or was reckless in not knowing, that Oak Hill's intent "to park its money in the Ohio Property by purchasing and holding TIC

13

interests in the short term may cause the IRS to invalidate the Section 1031 Exchange as not in compliance with the Section 1031 rules."

The Complaint alleges that Hamrick represented to Oak Hill in July and August 2018 that the Construction TIC transaction in Ohio with a buyback agreement complied with Section 1031, even though he knew that (1) Oak Hill would take title before the building was constructed, and (2) the building would not be constructed until after the exchange period closed. He knew or was reckless in not knowing that the Ohio TIC transaction he identified and recommended that Oak Hill purchase likely did not comply with the requirements of Section 1031. The Complaint claims that although Hamrick should have advised of the risks, he said nothing and did nothing so that he, and Ms. O'Toole, could receive approximately $200,000 as an undisclosed commission.

Oak Hill then agreed to purchase a 58.12% TIC interest in the Ohio Property for $3,554,202.60 with the intent of completing its Section 1031 exchange. Oak Hill entered into a Completion Guarantee Agreement with Rockwell, as well as a Buyback Agreement. Hamrick was aware of both, and reviewed both. On August 30, 2018, E&W wire transferred $3,554,202.60 on behalf of Oak Hill to First American Title Insurance Company. That same day, First American Title Insurance Company wire transferred all

14

of those funds to Rockwell's checking account. On August 28, 2018 (the date the Purchase and Sale Agreement was executed), Rockwell wire transferred $136,400 from its checking account to O'Toole Enterprises LLC. On August 30, 2018, Rockwell wire transferred an additional $177,500 to O'Toole Enterprises LLC. "Upon information and belief, these two payments (and perhaps other subsequent payments to O'Toole Enterprises LLC from Rockwell's checking account) reflect Mr. Hamrick and Ms. O'Toole's commission on Oak Hill's Ohio TIC purchase." Oak Hill did not discover these undisclosed payments were made to O'Toole Enterprises LLC until mid to late 2019.

On December 19, 2018, Oak Hill notified Hamrick that it intended to purchase an Aspen Dental and Five Star Urgent Care and wanted to sell all of its Ohio TIC interests to Rockwell immediately. Hamrick sent Mr. Cote an e-mail that stated: "We need to talk about this strategy, timing, etc. Selling this large of slice [of the Ohio TIC] in time for any specific close dates could be problematic unless you exersize [sic] your buyback option . . . my opinion (if you want it or not :)) . . . you are in much better shape with your Noah's holdings at 7%, 20YR absolute net lease, and 2% uplifts than with 5 Star locations . . . The underlying real estate proposition with the Noah's properties is much better than most of the urgent care locations that I've seen on their website." The Complaint

15

alleges that "Mr. Hamrick discouraged Oak Hill from getting out of the Ohio TIC in December 2018 even though he knew (or was reckless in not knowing) that Noah was a sinking ship and that construction of the building on the Ohio Property had barely begun." "After unsuccessful attempts to sell its TIC interests to other investors, Oak Hill exercised its right for Rockwell to buy back all of its Ohio TIC interests on February 25, 2019. To date, Rockwell has not bought back Oak Hill's Ohio TIC interests and has not paid Oak Hill anything for those interests."

On January 3, 2019, Ms. O'Toole (as President and Operations Manager at E&W) sent a letter to Oak Hill providing documentation, representing that E&W received the sum of $7,650 for consulting and qualified intermediary services. She did not disclose the commission in the letter.

*Ohio TIC Fallout*

Any preliminary construction work at the Ohio Property ceased by the spring of 2019, and only partially constructed exterior walls currently exist on the property. In 2019, the fair market value of the Ohio Property was approximately $630,000, and contractors have recorded about $430,000 in mechanics' liens for unpaid work. The property is in foreclosure proceedings, and taxes on it have not been paid. The Complaint states that, "[u]pon information and belief, none of the $3,554,202.60 that Oak Hill paid for its Ohio TIC interests was

16

used by Rockwell or Noah/Gabriel Management Corporation to construct the building on the Ohio Property. Instead, it was diverted to pay undisclosed commissions, rents owed to prior investors, and the costs to construct other Rockwell/Noah buildings in the country."

On May 28, 2019, Noah filed a Chapter 11 Voluntary Petition for bankruptcy protection in the United States District Court for the District of Utah.

*Utah Case*

On January 3, 2020, Oak Hill and several other plaintiffs filed suit against several defendants in the U.S. District Court for the District of Utah. Though E&W and Hamrick were both defendants to the suit, in the complaint Oak Hill made sure to clarify that it was not pursuing its claims against Hamrick and E&W in Utah:

> Plaintiff Oak Hill Management, Inc. is a Vermont corporation with its principal place of business in Vermont. Oak Hill Management, Inc. is currently pursuing claims against Rockwell and Ashby in a separate action. To serve the interest of judicial economy, Oak Hill Management, Inc. has elected not to assert claims against these Defendants in this case. Oak Hill Management, Inc. has further elected not to join in the claims against Defendants Edmund & Wheeler, John Hamrick and Chris Brown asserted in this case. Oak Hill Management, Inc. joins in the claims against all other Defendants, and reserves the right to amend the Complaint to add its claims against additional Defendants as circumstances may dictate.

Comp. at ¶ 58, *Fucci, et. al. v. Bowser, et. al.,* C.A. No. 2:20-cv-00004-DBB-DAO (D. Utah filed Jan. 3, 2020). On September 2,

2020, Rockwell filed for bankruptcy and an automatic stay was issued in the case; however, on May 3, 2021, the Utah district court issued a memorandum decision and order granting a motion to vacate the stay for the other parties.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When considering a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Beyond the general motion to dismiss standard of review, two heightened pleading requirements are relevant to this case. The first is Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the

18

circumstances constituting fraud[.]" This means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills*, 12 F.3d at 1175. The second heightened pleading requirement comes from the Private Securities Litigation Reform Act of 1995 ("PSLRA"):

> [P]rivate securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal. *See* 15 U.S.C. § 78u-4(b)(3)(A). In pleading scienter in an action for money damages requiring proof of a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Furthermore, "[i]f the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.'" *Id.* at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

    III. DISCUSSION

A. CLAIM SPLITTING

As a preliminary issue, Defendants argue that the entire complaint should be dismissed because Oak Hill "should not be permitted to maintain two lawsuits regarding the same subject, and the same set of facts, in two district courts." ECF No. 23-1 at 27. According to Defendants, the lawsuits involve the same transaction. Additionally, the two suits would need overlapping discovery, because they involve the misrepresentation of the financial stability of Rockwell, Noah, and the Ohio Property. Defendants claim that there is a danger of inconsistent judgments, including "Plaintiff's assertion that the TIC interests are securities, and what the Defendants knew and when they knew it" as well as Defendants' motion to dismiss the Utah Complaint. Defendants argue that Oak Hill is violating the rule against claim-splitting.

The Second Circuit has recently explained the contours of claim splitting as follows:

> As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit. This is because a plaintiff has no right to maintain two actions on the same subject in the same court, against the same defendant at the same time. In order for the rule to be properly invoked, however, the case must be the same. As the Supreme Court recognized over a century ago, there must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.

This rule, known as the rule against duplicative litigation, sometimes termed the rule against claim-splitting, is distinct from but related to the doctrine of claim preclusion or *res judicata*. The rule and the doctrine serve similar goals of fostering judicial economy, protecting the parties from vexatious and expensive litigation, and ensuring the comprehensive disposition of litigation. As the Seventh Circuit put it, claim splitting is an *aspect* of the law of preclusion. Lawyers often use the words 'res judicata' to summon up all aspects of preclusion. Because they are animated by similar policy goals and concerns, we frequently apply principles governing the doctrine of claim preclusion to the rule against duplicative litigation.

The vital difference between the rule against duplicative litigation and the doctrine of claim preclusion, however, is that the former can only be raised to bar one of two suits that are both still pending; the latter is generally raised, after a prior suit is resolved on the merits to preclude a party (or its privy) from relitigating claims in a subsequent suit that were or could have been raised in the prior action.

*Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504-05 (2d Cir. 2019) (internal citations and quotation marks omitted). In this case, Oak Hill has joined other plaintiffs in a suit against Rockwell in the District of Utah. However, in joining the general suit, Oak Hill elected not to join in the claims against Defendants E&W and Hamrick. Defendants do not explain how Oak Hill is violating the rule against claim-splitting where Oak Hill did not bring suit against the same parties twice. Furthermore, Oak Hill need not bring suit against all defendants at once unless there is privity among the parties, which Defendants do not argue there was. *See Cent.*

*Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 367 (2d Cir. 1995) ("When a litigant files consecutive lawsuits against separate parties for the same injury, the entry of a judgment in the prior action does not bar the claims against other potentially liable parties."); *Burberry Ltd. v. Horowitz*, 534 F. App'x 41, 46 (2d Cir. 2013) (noting that the concepts of res judicata, privity and claim preclusion "preclude a plaintiff from using successive actions to seek damages arising out of a single incident against the same defendant or those in privity with him.") The Court thus finds that this suit is not duplicative of the suit brought in the District of Utah.

    B. SECURITY CLAIMS

    1. Evaluating the TIC

    Another threshold issue in this case is whether the TIC can be considered a security, and thus whether it is covered by federal (and state) statutes regulating securities. For the purpose of federal law, a "security" is defined as an "investment contract." 15 U.S.C. § 77b(a)(1). The Supreme Court has explained that an "investment contract" is a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party[.]" *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *see also Revak v. SEC Realty*

*Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) ("The three elements of the *Howey* test must all be present for a land sale contract to constitute a security: (i) an investment of money (ii) in a common enterprise (iii) with profits derived solely from the efforts of others."). When deciding what constitutes a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also Howey*, 328 U.S. at 299 (explaining that the investment contract definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits"). Defendants argue that Oak Hill has not plausibly alleged that the Ohio Property interest constituted a security, because under the *Howey* test Oak Hill has not alleged facts demonstrating a common enterprise or facts that show Oak Hill expected profits "solely from the efforts of others."

"A common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87. This is exactly what Oak Hill has alleged: TIC interests sold to investors. "Mr. Hamrick and Rockwell represented and promised

Oak Hill ownership in a 12,000 square foot, state-of-the-art commercial building with a stable and profitable tenant. They also represented and promised Oak Hill an 8.5% average return on its investment over the lift of the 20-year Noah lease." The Court finds that these allegations are sufficient to make out horizontal commonality.

Defendants also argue that Oak Hill's expected profit from the investment is not alleged to have been derived "solely from the efforts of others." Yet the Second Circuit has held that "the word 'solely' should not be construed as a literal limitation[.]" *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008). Rather, a court must "consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *Id.* (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)). This means that companies seeking passive investors are treated differently from "situations where there is a reasonable expectation" of "significant investor control." *Id.* (internal quotation marks and citation omitted). "It is the passive investor for whose benefit the securities laws were enacted; where there is a reasonable expectation of significant investor control, the protection of the 1933 and 1934 Acts would be unnecessary." *Id.*

24

(internal quotation marks and citation omitted). Thus, in
*Leonard*, the court considered the totality of the circumstances
and concluded that "the jury could have determined that,
notwithstanding the organizational documents drafted to suggest
active participation by members, the defendants sought and
expected passive investors for Little Giant and Heritage, and
therefore the interests that they marketed constituted
securities." *Id.* at 91. "The question is whether an investor, as
a result of the investment agreement itself *or the factual
circumstances that surround it*, is left unable to exercise
meaningful control over his investment." *Id.* at 91 (emphasis
added in *Leonard*) (quoting *Robinson v. Glynn*, 349 F.3d 166, 170
(4th Cir. 2003)).

At this stage of litigation, the facts alleged could show
that the investment was expected to be passive. Defendants point
to Sections 3 and 6 of the Tenants-In-Common Agreement,[6] which
provide the Owners with operating and management requirements

---

[6] Defendants ask the Court to take notice of the Tenants-In-
Common Agreement, because though it was not attached to the
complaint it is "central to the controversy, and is referred to
and relied upon by Plaintiff in its complaint, and thus may
properly be considered." The Court takes notice. *See L-7
Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)
("A complaint is also deemed to include any written instrument
attached to it as an exhibit, materials incorporated in it by
reference, and documents that, although not incorporated by
reference, are 'integral' to the complaint." (alteration
omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.
2004))).

that include the responsibility to pay expenses not paid by the
tenant, improvements should they improve the property, voting
rights, management and management agreement rights, and more.
However, other factual allegations do not support the reading of
the owners as active managers of their investments. The
complaint alleges that Hamrick told the Cotes that the TIC was
"super low risk" because Noah was responsible for paying all
property taxes, maintenance fees, and insurance premiums. The
Rockwell Offering Memorandum, attached to the Complaint as
Exhibit 3, states that the TIC constitutes "interests in real
property" and not securities. However, it also states: "One of
the many appealing aspects of this lease is that Noah pays
directly all of the taxes, insurance premiums and all of the
maintenance costs of the building. Therefore, the property co-
owners have no active management duties, rendering this triple-
net lease property a hassle-free, real estate investment."

There are thus competing allegations and contradictory
statements about the level of involvement the investors would
have in the investment. However, this litigation is at an early
stage. As other district courts in the Second Circuit have done,
the Court finds that, given these competing allegations, the
question of whether or not the transaction constituted an
investment contract is more appropriately addressed in a summary

judgment motion. *See Schentag v. Nebgen*, No. 1:17-cv-8734-GHW, 2018 WL 3104092, at *7 (S.D.N.Y. June 21, 2018).

2. Federal Securities Claims (Counts Six and Seven)

Count Six of the Complaint alleges that Hamrick and E&W committed federal securities fraud for violations of Section 10(b) of the Exchange Act and Rule 10b-5. Count Seven alleges control person liability against Hamrick and O'Toole for violations of Section 20(a) of the Securities Exchange Act. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading …." 17 C.F.R. § 240.10b-5. "To succeed on a §10(b) and Rule 10b-5 claim, a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *GAMCO*

*Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217
(2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund,
Inc.*, 573 U.S. 258, 267 (2014)).

a. Statements or Omissions

Defendants first argue that Oak Hill has not adequately
alleged actionable misstatements or omissions. "An alleged
misrepresentation is material if 'there is a substantial
likelihood that a reasonable person would consider it important
in deciding whether to buy or sell shares of stock.'" *Singh v.
Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *Operating
Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595
F.3d 86, 92-93 (2d Cir. 2010)). The misrepresentation must, "in
the view of a reasonable investor, have significantly altered
the total mix of information available." *Id.* (internal quotation
marks and citation omitted). Omissions can be actionable under
the securities laws only when the defendant is subject to a duty
to disclose the omitted facts. *See Stratte-McClure v. Morgan
Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). In general, the issue
of materiality "requires delicate assessment of the inferences a
'reasonable shareholder' would draw from a given set of facts
and the significance of those inferences to him, and these
assessments are peculiarly ones for the trier of fact." *TSC
Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). For
this reason, courts often consider materiality to be "a fact-

intensive inquiry more appropriate for summary judgment or trial[.]" *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

Plaintiff alleges several misstatements and omissions: that Hamrick said the minimum floor for investment in the Ohio Property was $1 million; that Defendants promised to disclose referral fees but instead concealed them; that Hamrick stated that Noah never missed rent and the TIC was a super low risk investment; that Hamrick stated the building would be completed no later than January 2019; and that Hamrick stated he "practically owned" Noah's Bedford event venue, when he actually only owned 4% in it. Plaintiff also alleges that Hamrick adopted and distributed Rockwell and Noah's material misrepresentations and omissions by providing Oak Hill with Rockwell's Offering Memorandum. The Court cannot say as a matter of law that a reasonable investor would not find that these statements altered the total mix of information available.

Defendants argue that the statements about Rockwell being a good investment and the completion date were an opinion and corporate optimism, respectively. "[S]tatements of opinion 'include subjective statements that reflect judgments as to values that [are] not objectively determinable.'" *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018) (alteration in original) (quoting *In re Gen.*

29

*Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012)). "Puffery encompasses 'statements [that] are too general to cause a reasonable investor to rely upon them' . . . and thus 'cannot have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (internal citations and quotation marks omitted). Though any statements by Hamrick that Noah was a "good investment" would likely be opinion, the Court does not find that his statements that it was super low risk or that the completion date would be no later than January 2019 were such. The Complaint alleges that: Noah was experiencing significant financial hardship in 2017, such that it needed a $6 million loan from Rockwell; Noah was failing to make timely rent and/or tax payments on many of its properties in 2018; Hamrick had received and was in possession of Noah's financials, and was in regular possession of or had access to Rockwell's financials; and Hamrick "had a long-standing relationship with Rockwell and Noah dating back years." Given these allegations, and the early stage of the litigation, Oak Hill may be able to show that there were actionable misstatements and omissions.

Defendants further argue that Plaintiff did not rely on the statements about the minimum floor or the building completion date. According to defendants, "any alleged reliance by Plaintiff on generally alleged representations made by the

30

Defendants, in light of the definitive written guarantees, representations and warranties set forth in the documents appended to the Complaint is unreasonable as a matter of law, and any causal link is broken by the superseding intentionally wrongful and deceptive conduct by Rockwell. Plaintiff also states no facts known to Hamrick that would show Hamrick knew or recklessly failed to know that the building could not be built in that time frame." However, given the allegations in the Complaint, the Court cannot say that Plaintiff did not rely on these statements as a matter of law. The Consulting Agreement had specifically listed Noah's Event Centers as one of the properties that E&W would evaluate based on its previous experience. As discussed above, the Complaint also alleges that Hamrick had a long relationship with Noah and Rockwell, as well as possession of their financial information. Furthermore, the Complaint alleges that Plaintiff believed that Hamrick had personally invested, to a much larger extent than was true, because of other misstatements made by him. Additionally, Plaintiff points to allegations in the Complaint surrounding the role played by Hamrick during the purchase of the Maine Property, which Hamrick carefully vetted for them.

Defendants next argue that there could have been no proximate causation where Plaintiff had its own attorney to conduct due diligence. Though this argument may bear out later

in the litigation, at this time the Court cannot conclude as a matter of law that, based on the allegations set forth in the Complaint, the Oak Hill's injury was not proximately caused by Defendants instead of Oak Hill's attorneys.

Finally, with regard to the Offering Memorandum, the Court notes that Securities and Exchange Commission Rule 10b-5 makes it unlawful:

(a)   To employ any device, scheme, or artifice to defraud,

(b)   To make any untrue statement of a material fact . . ., or

(c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR §240.10b-5. In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court examined Rule 10b-5(b) and held that the "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. However, in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), the Court examined parts (a) and (c) of the rule and found that those who do not make, but who disseminate false or misleading statements to potential investors with the intent to defraud, can be found to have violated those provisions. At this time, Defendants argue that Hamrick did not make the statements in the Offering Memorandum under part (b) of

the rule, but Defendants do not make arguments regarding part
(a) or (c) of the rule. Instead, Defendants say that "[a]lthough
the Supreme Court has left open the possibility that a defendant
could be held liable for also disseminating false statements,
Plaintiff would have had to adequately allege scienter as to the
dissemination, which it has not done . . ." The Court therefore
turns to the issue of scienter.

   b. Scienter

   The Supreme Court has explained that, though plaintiffs
must state with particularity facts giving rise to scienter,
"the court's job is not to scrutinize each allegation in
isolation but to assess all the allegations holistically."
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326
(2007). "[T]he reviewing court must ask: When the allegations
are accepted as true and taken collectively, would a reasonable
person deem the inference of scienter at least as strong as any
opposing inference?" *Id.* The Court has also noted that "personal
financial gain may weigh heavily in favor of a scienter
inference[.]" *Id.* at 325.

   Defendants argue that Oak Hill has not adequately alleged
scienter, especially where Plaintiff had their own attorney and
accountant to perform due diligence on the properties and where
Plaintiff has only provided conclusory allegations that Hamrick
knew the financial situation of Rockwell and Noah. Defendants

argue that there could be just as strong an inference that they are innocent, because Rockwell and Noah's "financials" may have been fraudulent as they may have kept double books. Hamrick further argues that, where he invested in Rockwell himself and where he referred other clients to Rockwell, one could infer from those facts that he was innocent. Even though Defendants acknowledge that the Complaint claims that Defendants failed to disclose their referral fees, they claim that "[i]n order to support a plausible inference that this was a motivation to commit fraud, Plaintiff would have to allege that the defendants would *not* have earned commissions if Plaintiff invested in other properties to which they introduced it." The Court does not find this argument to be persuasive.

Accepting the allegations in the Complaint as true, Defendants made misstatements about a property that they were accepting undisclosed referral fees for and thus "benefited substantially" from the fraud. The inference that Defendants had scienter is at least as strong as the opposing inference that Defendants ignorantly made statements that ultimately benefitted them financially more than they would have been benefitted had Oak Hill invested in another property. The Court finds that these allegations meet even the heightened pleading requirements for a securities fraud scienter claim. Whether Plaintiff can prove the claim is a different question. *See Matrixx*

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 50 (2011) (holding that "respondents have adequately pleaded scienter" but noting that "[w]hether respondents can ultimately prove their allegations and establish scienter is an altogether different question").

3. New Hampshire Securities Claims (Counts Eight and Nine)

In their Motion to Dismiss, Defendants argue that the state securities claims should be dismissed for similar reasons to their federal securities claim dismissal arguments. They argue that the transaction did not involve the sale of securities, and that the allegations fail to satisfy the particularized pleading requirements of Rule 9(b) fraud claims. For the reasons discussed above and below, the Court does not find this argument to be persuasive.

C. Professional Negligence (Count One)

In professional negligence cases, the plaintiff must prove facts upon which the law imposes a duty of care, breach of that duty, and proximate causation of harm. *Yager v. Clauson*, 169 N.H. 1, 5, 139 A.3d 1127 (2016). "Whether a duty exists in a particular case depends upon what risks, if any, are reasonably foreseeable." *Goodwin v. James*, 134 N.H. 579, 583, 595 A.2d 504, 507 (1991). Defendants argue that Plaintiff has not plausibly alleged that they acted in a way that fell below the applicable standard of care, where Plaintiff's own attorney was responsible

for due diligence and where "Plaintiff does not contend that the
IRS has invalidated the exchange or that it incurred avoidable
tax liability because of how the transaction was structured."
Plaintiff responds that Defendants failed to perform their
obligations under the Consulting Agreement by failing to
identify the Section 1031 risk associated with the purchase of
the Ohio TIC. There were two risks that Plaintiff calls
attention to: that the construction would not be completed and
that the property would not then validly be "like-kind", and
that Hamrick encouraged Oak Hill to enter into the Buy Back
Agreement when such an agreement carried its own risk that the
investment would not be considered continuous. Plaintiff claims
that these allegations show that Defendants fell below the
applicable standard of care, and, at this stage of litigation,
the Court agrees.

D. Breach of Contract (Count Two)

"Under New Hampshire law, a breach of contract occurs when
there is a failure without legal excuse to perform any promise
which forms the whole or part of a contract." *Teatotaller, LLC
v. Facebook, Inc.*, 173 N.H. 442, 447 (2020) (citation omitted).
"When interpreting a written agreement, we give the language
used by the parties its reasonable meaning, considering the
circumstances and the context in which the agreement was
negotiated, and reading the document as a whole." *Czumak v. N.H.*

36

*Div. of Developmental Servs.*, 155 N.H. 368, 373, 923 A.2d 208 (2007). "Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract." *Id.*

Defendants move to dismiss this count, arguing that they did not breach the Consulting Agreement. They say the contract never guaranteed a particular result, and that it clearly stated that the Defendants were not attorneys. Defendants also argue that the Consulting Agreement never required them to provide due diligence. Finally, Defendants argue that even if they did fail to disclose referral fees, "[g]iven all of the surrounding circumstances in the transaction, including the limited time allowed to complete a Section 1031 exchange, Plaintiff's motivation to avoid a six figure tax liability, and Plaintiff's own attorneys' involvement in selecting replacement properties, Plaintiff has not plausibly alleged a causal nexus between the alleged breach and its damages."

Yet the plain meaning of the contract did not completely absolve Defendants of any role in the exchange, even if it did not require them to provide due diligence. The Consulting Agreement still stated that Defendants would provide a "Risk/Reward analysis on replacement property options based on past experience and industry information"; that they would provide evaluation of various options from the standpoint of

1031 applicability and conformance and previous experience with certain property types and tenants; that they would provide ongoing Section 1031 education to assist in planning for and choosing replacement options, including on Section 1031 and "potential areas of risk" as well as "[c]ommunications with providers of replacement property options on Exchangor's behalf." The contract also noted that E&W would disclose referral fees. All of these provisions, when taken together, set out something more in the contract than what Defendants claim they were obligated to do. The misstatements allegedly made by Hamrick (discussed above) could be found to have breached the contract, in light of these provisions. Furthermore, Defendants could be found to have breached the express terms of the Contract where they agreed to educate Oak Hill about Section 1031 and instead provided falsities about the Aspen Dental properties and the cash loan. Finally, as Plaintiff points out, Defendants' actions during the Maine property purchase may demonstrate that they understood their role under the Consulting Agreement to be more than that of a passive participant. The Court denies dismissal on this claim at this early stage of litigation.

E. Breach of Fiduciary Duty (Count Three)

In New Hampshire, a fiduciary relationship is "a comprehensive term and exists wherever influence has been

acquired and abused or confidence has been reposed and betrayed." *Brzica v. Trs. of Dartmouth Coll.*, 147 N.H. 443, 447, 791 A.2d 990 (2002) (citation and quotation marks omitted). "A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." *Id.* at 447-48 (quotation marks and citation omitted).  Defendants argue that there was no fiduciary relationship in this case, because (1) other fiduciaries were involved, including an attorney and an accountant; (2) the breach of any alleged duty would have occurred in the "recommendation and representation of an investment opportunity" and not in the execution of the Section 1031 Exchange, and (3) qualified intermediaries are not fiduciaries. The Court finds all three arguments to be unpersuasive at this stage of the litigation. As discussed above, the plain terms of the contract set out a more involved role in the Section 1031 exchange for E&W than Defendants now argue they had.[7] Further discovery may show that Defendants were

---

[7] To support their third point, Defendants cite to a Fourth Circuit case, *Terry v. SunTrust Banks, Inc.*, 493 Fed. Appx. 345, 347 (4th Cir. 2012), and a New York state court case, *Demetriades v. Royal Abstract Deferred, LLC*, 2017 N.Y. Misc. LEXIS 1666 (N.Y. S.Ct. May 2, 2017). These authorities are persuasive, not controlling. Furthermore, *Terry* bases its holding on Virginia law, and *Demetriades* bases its holding on the exchange agreements at issue in that specific case.

not fiduciaries, but at this stage of the litigation the Court does not find that, as a matter of law, they were not.

F. Fraud (Count Four)

Defendants move to dismiss Count Four, arguing that Plaintiff has not alleged any facts which give rise to a strong inference of fraudulent intent. For the reasons set forth above in the federal securities claims section, however, the Court finds that Plaintiff has alleged adequate facts at this stage of litigation and thus **denies** dismissal on this claim.

G. Negligent Misrepresentation (Count Five)

A claim of negligent misrepresentation under New Hampshire law involves the negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff. *Snierson v. Scruton*, 145 N.H. 73, 78, 761 A.2d 1046 (2000). Defendants move to dismiss the negligent misrepresentation claim, arguing as they did with the federal securities claims that the statements made by Defendants were only puffery opinions. For the reasons set forth above, the Court **denies** dismissal on this claim.

H. Defendant O'Toole

Defendant O'Toole separately moved for dismissal, arguing that there was no jurisdiction over her. On a motion pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of making a prima facie showing that jurisdiction

exists. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). In deciding such a motion, a district court "may look to evidence outside the pleadings." *Seaweed Inc. v. DMA Prod. & Design & Mktg. LLC*, 219 F. Supp. 2d 551, 554 (S.D.N.Y. 2002).

   1. Personal Jurisdiction Over Federal Claims

   Section 27 of the Exchange Act governs the exercise of personal jurisdiction in securities cases. *See* 15 U.S.C. §§ 77v, 78aa. Because Section 27 "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment," the personal jurisdiction challenge "must be tested against due process standards." *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). This "analysis consist[s] of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citation omitted).

   The minimum contacts test is met. "Because the Exchange Act authorized worldwide service of process, the relevant contacts for purposes of the 'minimum contacts' analysis are those with the United States as a whole." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017). Defendants agree that "O'Toole obviously has sufficient minimum contacts with the United States to support jurisdiction[.]" ECF No. 24-1 at 13.

As for the reasonableness analysis, courts must evaluate
the following factors:

> (1) The burden that the exercise of jurisdiction will impose
> on the defendants; (2) the interests of the forum state in
> adjudicating the case; (3) the plaintiff's interest in
> obtaining convenient and effective relief; (4) the interstate
> judicial system's interest in obtaining the most efficient
> resolution of the controversy; and (5) the shared interest of
> the states in furthering substantive social policies.

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d
Cir. 2010) (citing *Asahi Metal Indus. Co. v. Superior Court*, 480
U.S. 102, 113-14 (1987)). "While the exercise of jurisdiction is
favored where the plaintiff has made a threshold showing of
minimum contacts at the first stage of the inquiry, it may be
defeated where the defendant presents 'a compelling case that
the presence of some other considerations would render
jurisdiction unreasonable.'" *Id.* (citing *Burger King Corp. v.
Rudzewicz*, 471 U.S. 462, 477 (1985)). Here, O'Toole argues that
it is unreasonable to ask her to defend against the federal
claims in the District of Vermont, when her state law claims
would be "dismissed (presumably to be refiled in New
Hampshire)[.]" ECF No. 24-1 at 14.

However, under the doctrine of pendent personal
jurisdiction, the Court could exercise jurisdiction over
O'Toole's state claims. "The doctrine of pendent personal
jurisdiction provides that 'where a federal statute authorizes

42

nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available.'" *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018) (quoting *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)). Because the Court has personal jurisdiction over O'Toole under the Exchange Act, and it could find that the state law claims derive from a common nucleus of operative facts to the securities claims, it may be able to exercise pendent jurisdiction over the state claims. In that case, the Court need not separately analyze whether personal jurisdiction would be available under the state law claims alone. *See Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, No. 5:13-CV-746 (MAD/ATB), 2014 U.S. Dist. LEXIS 130677, at *54 (N.D.N.Y. Sep. 19, 2014) ("The Court has found that it has personal jurisdiction over [the defendant] under the Exchange Act, and (as Defendants concede) the state law claims derive from the common nucleus of operative facts with the federal claims. Therefore, the Court may exercise pendent jurisdiction over the state law claims and need not reach the question whether personal jurisdiction over Defendant Miller as to the state law claims is otherwise available."). With this said, should the Court dismiss the

federal claim against O'Toole, it need not exercise pendent

jurisdiction over the state claims (nor would it be logical to

do so).

      2. Control Person Liability

Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any
> person liable under any provision of this title or of any
> rule or regulation thereunder shall also be liable jointly
> and severally with and to the same extent as such
> controlled person to any person to whom such controlled
> person is liable . . . , unless the controlling person
> acted in good faith and did not directly or indirectly
> induce the act or acts constituting the violation or cause
> of action.

15 U.S.C. § 78(t)(a). "[T]o plead a prima facie case" of control

person liability, a plaintiff must "allege '(1) a primary

violation by the controlled [entity], (2) control of the primary

violator by the defendant, and (3) that the defendant was, in

some meaningful sense, a culpable participant in the controlled

person's fraud.'" *In re Fannie Mae 2008 Sec. Litig.*, 742 F.

Supp. 2d 382, 415 (S.D.N.Y. 2010) (quoting *In re Scottish Re

Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007)).

"Control over a primary violator may be established by showing

that the defendant possessed 'the power to direct or cause the

direction of the management and policies of a person, whether

through the ownership of voting securities, by contract, or

otherwise.'" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). "It is

not sufficient for a plaintiff to allege that an individual
defendant has control person status; instead, the plaintiff must
assert that the defendant exercised actual control over the
matters at issue." *In re Fannie Mae*, 742 F. Supp. 2d at 415.
Furthermore, "status as an officer or committee member is
generally not enough to constitute control" and a "mere
recitation" of the defendant's position title is not sufficient.
*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 494 (S.D.N.Y.
2005); *see also City of Westland Police & Fire Ret. Sys. v.
MetLife, Inc.*, 928 F. Supp. 2d 705, 720-21 (S.D.N.Y. 2013)
("Neither director status nor mere membership on an audit
committee, standing alone, is sufficient to demonstrate actual
control over a company or an allegedly fraudulent transaction."
(citation omitted)).

As discussed above, Plaintiff has alleged enough to state a
claim for misstatements and omissions. Thus, Plaintiff satisfies
the "primary violation" requirement. As far as the "control"
requirement, it is not enough for Plaintiff to point to
O'Toole's position as E&W's President and Operations Manager.
Yet Plaintiff alleges little more than this.[8] According to

---

[8] Defendants are correct in pointing out that any facts contained
in the affidavit attached to Plaintiff's response to O'Toole's
motion to dismiss, as well as any new facts contained in the
response itself cannot be considered here, where they were not
set forth in the Complaint.

Plaintiff, O'Toole is the "managing broker of E&W and assists with the daily operations to ensure professional, smooth transactions." The Complaint also generally asserts that "Mr. Hamrick and Ms. O'Toole have the power to direct or cause the direction of the management and policies of E&W in their positions as Vice President and President/Operations Manager, respectively." However, where the Complaint certainly alleges a factual basis for finding that this is true of Hamrick, it fails to do so for O'Toole besides putting forth this boilerplate language. It is simply not clear from the Complaint that O'Toole was performing more than administrative tasks with regard to the management and policies of E&W and Hamrick. Other statements, such as "Ms. O'Toole is Mr. Hamrick's colleague and life partner. She knew Mr. Hamrick was promoting Rockwell/Noah TIC investments to E&W's clients including Oak Hill" are likewise insufficient.

Plaintiff argues that it has alleged enough to find that O'Toole was in control. According to Plaintiff, "[O'Toole] exercised that control to ensure no kickbacks went through E&W's bank account but instead went through her brokerage bank account at O'Toole Enterprises." However, as Defendants point out, though the Complaint does allege that O'Toole Enterprises received the referral fees, the idea that O'Toole ensured that no kickbacks went through E&W's bank account is new to this

46

pleading. The Complaint itself only alleges that Rockwell made transfers to O'Toole, and that these transfers were undisclosed commissions. Furthermore, the three cases cited to by Plaintiff: *In re Pfizer Inc. Sec. Litig.*, 584, F. Supp. 2d 621, 641 (S.D.N.Y. 2008), *In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919 (E.D.N.Y. Oct. 9, 2020), and *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017), all involved complaints that alleged more than Plaintiff has done here.[9] Nor does Plaintiff argue that Hamrick was an employee of O'Toole.

---

[9] *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008) ("Plaintiffs have also alleged adequately--and Defendants do not dispute--that McKinnell, LaMattina, and Katen controlled Pfizer by virtue of their key positions with the company. (*See* CCAC PP 22, 26, 27 (describing defendants' high-level positions); *id.* P 35 (alleging that all of the Individual Defendants controlled Pfizer); *id.* P 38 ("By reason of their positions with the Company, the . . . Defendants attended management and/or board of directors meetings, and had access to internal Company documents, reports and other information, including adverse non-public information regarding Pfizer's business, operations, products and future prospects, and including non-public information concerning Celebrex and Bextra.").)."); *In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919 (E.D.N.Y. Oct. 9, 2020) (finding that an inside director and CEO had the ability to control the actions of subordinates making the actionable statements, but that the CFO who signed the form did not have control liability where the Complaint had failed to allege scienter, and that other defendants, controlling shareholders, had not been pled to have actual control); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) (finding one defendant liable for having control as an employer, but another not liable even where the plaintiff alleged that he held a position as an "officer and member of the Company's Executive Board" and alleged that he was in a position to control the contents of the findings, stating that "the allegation that Angelotti was charged, by virtue of his *status* as a member of a particular committee, with 'supporting' senior

The parties agree that the Second Circuit has not yet reached the question of the exact definition of the culpable participation requirement. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 n.24 (S.D.N.Y. 2004). Some district courts within the circuit have adopted the approach of holding the "culpable participation" element to the PSLRA standard, such that plaintiffs "must allege facts indicating that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). The Court finds that under this standard, Plaintiff has failed to allege culpability. In arguing that the Complaint does meet the "culpability" requirement, Plaintiff inexplicitly cites to portions of the Complaint that allege that Hamrick was involved. For example, paragraphs that state that "Hamrick had received and was in possession of" Noah and Rockwell's financials, and that "Hamrick knew (or was reckless in not knowing) that Noah was suffering financial hardship in July and

---

management's appraisals of disclosures and with 'examining' reports does not show that he exercised *actual control* over the dissemination of the alleged misstatements that he did not himself make or over the people who drafted or otherwise signed off on those misstatements.").

August 2018." But the Complaint never alleges these same facts with regard to O'Toole. It is a glaring omission.

The only specifics the Complaint alleges about O'Toole are that she called Mr. Cote and spoke with him about potentially attending a Rockwell open house at a Noah event center in New Hampshire. "During that telephone conversation, Ms. O'Toole spoke very highly of Rockwell and Noah as businesses and represented that investing in a Rockwell/Noah TIC was a great investment." However, this phone call is not even alleged to have involved a discussion about the Ohio Property specifically. The Complaint also states that on August 28, 2018, the date the Purchase and Sale Agreement was executed, "Rockwell wire transferred $136,400 from its checking account to O'Toole Enterprises LLC." Two days later, Rockwell transferred another $177,500. The Complaint alleges that "[u]pon information and belief, these two payments (and perhaps other subsequent payments to O'Toole Enterprises LLC from Rockwell's checking account) reflect Mr. Hamrick and Ms. O'Toole's commission on Oak Hill's Ohio TIC purchase" although Oak Hill itself did not discover these "undisclosed commission payments" until mid to late 2019. Finally, the Complaint alleges that on January 3, 2019, O'Toole sent a letter to Oak Hill to provide tax documentation, disclosing in that letter the sum of $7,650 that E&W received for consulting and qualified intermediary services

– but not disclosing the Rockwell commission. Though this letter is Plaintiff's strongest point in favor of control person liability, the Court will not allow a claim for control person liability based only on one letter wrapping up qualified intermediary services and omitting a referral fee. Though the receipt of the fee and its later omission in the letter would help an inference of scienter, the problem in this case is that nothing else ties O'Toole to the Ohio Property (an unusual omission, considering several paragraphs of the complaint explicitly tie *Hamrick* to it).

    For these reasons, the Court dismisses without prejudice the control person claim against O'Toole.

### 3. Minimum Contacts with Vermont

    Because the Court is granting dismissal on the control person federal securities claim against O'Toole, it declines to exercise pendent personal jurisdiction over the state law claims arising out of a common nucleus of operative facts at this time. Nor does the Court find that the requirements of due process are met here, such that the minimum contacts test is met.[10] Plaintiff

---

[10] The due process standard is still applicable even without the federal claim, because Vermont's long arm statute similarly does not place extra constraints on personal jurisdiction. "In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the court] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction[.]" *Brown v. Lockheed Martin Corp.*, 814 F.3d 619,

argues that specific jurisdiction exists over the two defendants, where they have "purposefully directed [their] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (internal quotation marks and citation omitted). Plaintiff argues that O'Toole's "August 2018 sales pitch" over the phone to Mr. Cote (who was working and residing in Vermont, and had a Vermont phone number), combined with her January 3, 2019 letter addressed to Vermont, are sufficient minimum contacts to satisfy due process. Yet, as Defendants point out, "the plaintiff cannot be the only link between the defendant and the forum"; rather, "[d]ue process requires that a defendant be haled into court in a forum State based on his own

---

624 (2d Cir. 2016) (citing Fed. R. Civ. P. 4(k)(1)(A)). Vermont's long-arm statute allows courts to exercise personal jurisdiction over nonresident defendants "to the full extent permitted by the . . . Due Process Clause" of the Fourteenth Amendment. *State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 10, 201 Vt. 342, 349, 142 A.3d 215, 220 (internal quotation marks omitted). As a result, "the first part of [the] inquiry – the interpretation of the Vermont law governing service of process – merges with the second part of the jurisdictional test: whether the court's exercise of personal jurisdiction over the defendant satisfies the requirements of due process." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). Thus, the issue here is whether the court's exercise of personal jurisdiction over O'Toole would satisfy the requirements of due process.

affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden v. Fiore*, 571 U.S. 277, 285-86 (2014) (quoting *Burger King Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). As Defendants point out, "Plaintiff has not even claimed that O'Toole Enterprises or Ms. O'Toole purposefully reached out to or targeted the forum states or its citizens. Indeed, Plaintiff alleges that it was referred to EWI by its attorney and that it reached out to EWI in New Hampshire, not the other way around. Plaintiff cannot even argue that it suffered damages in Vermont. The subject Section 1031 Exchange involved property in Connecticut, Maine, and Ohio. The loss of value Plaintiff suffered took place in Ohio." The Court finds that there are not minimum contacts with the state specifically, and that it would not be reasonable for O'Toole to have to defend her claims here. However, the Court notes that Oak Hill requested "the opportunity to conduct jurisdictional discovery if the Court determines it does not have personal jurisdiction over the O'Toole Defendants for all claims asserted against them in the Complaint." The Court will allow them to do so. Plaintiff may submit a memorandum to the Court within 30 days describing the discovery they wish to conduct.

I. Defendant O'Toole Enterprises

Plaintiff alleges no additional reasons why there would be jurisdiction over Defendant O'Toole Enterprises, and the Court similarly finds that it lacks jurisdiction over this Defendant.

IV.  Conclusion

For the reasons set forth above, the motion to dismiss filed by Edmund & Wheeler, Inc. ("E&W") and John Hamrick ("Hamrick") is **denied** (ECF No. 23). The motion to dismiss filed by Mary O'Toole and O'Toole Enterprises, LLC, is **granted**, and those claims are **dismissed without prejudice** (ECF No. 24).


DATED at Burlington, in the District of Vermont, this 27th day of August, 2021.


/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge