```
                  UNITED STATES DISTRICT COURT
                            FOR THE
                     DISTRICT OF VERMONT

OAK HILL MANAGEMENT, Inc.,      )
A Vermont Corporation,          )
                                )
      Plaintiff,                )
                                )
      v.                        )    Case No. 2:20-cv-124
                                )
EDMUND & WHEELER, INC.,         )
A New Hampshire Corporation,    )
O'TOOLE ENTERPRISES LLC,        )
A New Hampshire                 )
Limited Liability Company,      )
JOHN D. HAMRICK,                )
An individual                   )
MARY O'TOOLE, an individual     )
MCLANE MIDDLETON,               )
PROFESSIONAL ASSOCIATION,       )
A New Hampshire Domestic        )
Professional Profit             )
Corporation                     )
JOHN G. BURK & ASSOCIATES,      )
CERTIFIED PUBLIC ACCOUNTANTS,   )
P.C., a New Hampshire           )
Domestic Professional           )
Profit Corporation              )
AND DANIEL J. ANTOSIEWICZ,      )
An individual                   )
                                )
      Defendants.               )
```

## OPINION AND ORDER

Plaintiff Oak Hill Management, Inc. ("Oak Hill") brought this suit against Defendants alleging fraud, negligence, breach of fiduciary duty, breach of contract, and sale of unregistered securities in connection with Plaintiff's investment in an Ohio property during a Section 1031 exchange. Oak Hill filed its First Amended Complaint ("FAC") also alleging professional

negligence[1] (Count Twelve), conversion (Count Thirteen), and a violation of the Vermont Consumer Protection Act ("VCPA") (Count Fourteen) against Mr. Hamrick, Ms. O'Toole, and O'Toole Enterprises. Before the Court is Defendants' partial motion to dismiss of Counts Twelve, Thirteen, and Fourteen (ECF No. 44).

For the reasons set forth below, the pending motion to dismiss is granted in part and denied in part.

## Factual Background

Plaintiff Oak Hill Management, Inc. ("Oak Hill") is a Vermont corporation owned and operated by Eugina Cuomo Cote and Marc P. Cote (the "Cotes"). The Cotes created Oak Hill after Mrs. Cote inherited Whitney Village, a 57-unit residential apartment complex located in Hamden, Connecticut. In the summer of 2018, the Cotes sold Whitney Village to Quinnipiac University. During that transaction, an attorney suggested that the Cotes complete a Section 1031 exchange to defer the taxable capital gains on the sale. Put simply, a Section 1031 exchange "allows taxpayers who have realized capital gains from the sale of real property ('relinquished property') to defer taxes on those gains to the Internal Revenue Service ('IRS') when the relinquished property is 'exchanged solely for real property of

---

[1] Oak Hill had previously alleged professional negligence against Mr. Hamrick and E&W in the original Complaint. *See* ECF No. 1 at 33.

like kind'('replacement property') which the taxpayer will hold 'either for productive use in a trade or business or for investment.'" *See* ECF No. 37 at 8 (citing 26 U.S.C. § 1031(a)(1)).

To facilitate its exchange, Oak Hill retained an accountant, a lawyer, and Edmund & Wheeler, Inc. ("E&W"), to act as a Qualified Intermediary ("QI"). In general, QIs "hold the net sale proceeds from the sale of relinquished property in an escrow account, and then use those funds to acquire replacement property on behalf of the taxpayer." *See* ECF No. 37 at 10. "Section (a)(1) regulations contain certain safe harbor provisions that avoid constructive or actual receipt of sale proceeds from the relinquished property by the taxpayer when a QI is involved." *Id*. E&W is a New Hampshire corporation with its principal place of business in Franconia, New Hampshire. John D. Hamrick is E&W's Vice President and Director, and Mary O'Toole is E&W's President and Operations Manager. E&W purports to be a leading Section 1031 consulting firm.

McLane Middleton, a New Hampshire professional profit corporation, referred Oak Hill to Hamrick. On January 24, 2018, E&W and Oak Hill entered into an Exchange Services & Consulting Agreement (the "Consulting Agreement"),[2] pursuant to which E&W

---

[2] The Consulting Agreement is attached to the Complaint as Exhibit 1.

would act as the QI in the 1031 Exchange. Section 2.0 of the
Consulting Agreement explains that E&W will provide "exchange
consulting" which will include, but not be limited to:

1. Overall strategy & education related to Section 1031
replacement property strategies, including:
    a. Whole Ownership of NNN Leased Properties
    b. Fractional Ownership of NNN Leased Properties
    c. Fractional DSTs and "REIT-like" investment
    opportunities
    d. Oil & Gas (Subsurface Rights)
    e. Conversion of Investment Real Estate to
    Personal Use Real Estate
2. Introductions to various providers of replacement
property options for the purposes of education,
product availability, due diligence, etc. Also, the
provision of specific information on properties and
sponsors that Edmund & Wheeler has worked with
extensively.
3. Risk/Reward analysis on replacement property
options based on past experience and industry
information.
4. Strategy pertaining to the holding entity(ies) of
the replacement properties moving forward.
5. Evaluation of various options from the standpoint
of:
    a. 1031 applicability and conformance.
    b. Cash flow and NOI analysis.
    c. Leverage, debt and loan package analysis.
    d. Previous experience(s) with providers of such
    options.
    e. Assistance in reviewing offering packages with
    review level input.
    f. Previous experience with certain property
    types and tenants (i.e. CVS, Walgreens, Fresenius
    Medical, Noah's Event Centers, Tractor Supply,
    Advanced Auto Parts, BoJangles)

Please note that Edmund & Wheeler, Inc. does not
operate in a "Broker Relationship" of any kind with
the Exchangor. Edmund & Wheeler, Inc. can derive
referral fees from certain providers of replacement
real estate, and will disclose those potential fees.
Working with these providers can significantly reduce
the consulting charges in this Agreement.

Buying certain types of real estate require a thorough review by your attorney, tax and financial advisors. Edmund & Wheeler does not provide legal advice.

Please note that certain replacement options require that the investor be an "accredited" investor, Edmund & Wheeler makes no claim to the Exchangor's suitability for any investment, but will work with Exchangor to determine eligibility.

6. On-Going Section 1031 education to assist in planning for and choosing replacement options, including:
    a. Applicable Section 1031 rules & regulations.
    b. Specific statutory items related to Section 1031.
    c. Identification rules & identification strategy.
    d. Section 1031 standard practices and potential areas of risk.
    e. Safe Harbor analysis for real estate conversion.
    f. Support of tax and legal professionals in the evaluation of potential replacement property options.
    g. Communications with providers of replacement property options on Exchangor's behalf.
    h. Provide references of past exchangors that have evaluated and purchased similar replacement property options where applicable.

ECF No. 1-1 at 2.

Section 3.0 of the Consulting Agreement explains what E&W would do under the "exchange facilitation." The facilitation responsibilities include strategy, support, preparation of documents, review of "all deeds, offers, contracts, Purchase & Sale Agreements and other pertinent documents associated with the Exchange for both Relinquished and Replacement Properties," coordination and

5

communication with the various professionals, safeguarding
the escrow funds, assistance with time deadlines, "ensuring
all aspects of the Exchange are in strict compliance with
federal tax laws as they pertain to IRC Section 1031," and
more. *Id.* at 3. Page six of the Consulting Agreement
contains the following note: "PLEASE NOTE: Edmund &
Wheeler, Inc. does not provide legal or tax advice during
this transaction. As Exchange Accommodator and Qualified
Intermediary, Edmund & Wheeler, Inc. is not responsible for
calculating capital gains taxes on a state or federal
level. You are urged to seek the services of qualified
professionals. We strongly suggest that you understand your
capital gains exposure before, during and after the
exchange." *Id.* at 6. The last page of the Consulting
Agreement includes a "REFERRAL FEE DISCLOSURE" warning
which states that "Edmund & Wheeler, Inc. could receive
financial consideration for referring clients to real
estate brokers or developers offering replacement property
options. Edmund & Wheeler, Inc. does not enter a Broker
relationship with any client. Edmund & Wheeler, Inc. does
NOT receive any compensation whatsoever from securities-
based replacement property options including Delaware
Statutory Trusts (DSTs) or subsurface mineral rights." *Id.*
at 7.

The Complaint alleges that "[o]nce the Consulting Agreement was executed, E&W proposed and/or analyzed several replacement properties for Oak Hill to purchase in exchange for Whitney Village. Mr. Hamrick's analysis included the risks presented by the tenant in the building to be purchased, the need for due diligence into the building owner and tenant, and inspection of the facilities." *See* ECF No. 1 at 10.

**Maine Property**

Before selling Whitney Village, Oak Hill alleges in the Complaint that it bought a replacement property in Maine on May 30, 2018. "Mr. Hamrick identified, vetted, and was actively involved in the consummation of the purchase of the Maine Property." *See id.* at 11. He was involved in negotiating the terms of the purchase with the seller; he drafted the letter of intent on behalf of Oak Hill; he included a due diligence period as a condition to the purchase and commented on the due diligence materials; he suggested that Oak Hill receive financial statements and a business plan for the tenant; and, he informed Oak Hill that the numbers were only as good as the stability of the tenant. Additionally, he advised Oak Hill on the requirements of the Section 1031 process.

Then, "[t]o facilitate the reverse exchange, E&W created a special purpose entity, Oak Hill Management SPE, LLC ("SPE"), to 'park' the title to the Maine Property until after the Whitney

Village transaction closed. After the Whitney Village transaction closed, the SPE would transfer title to the Maine Property to Oak Hill." *See id.* at 12. The SPE, which was controlled and operated by Hamrick, purchased the Maine Property for $4,250,000 and funded this purchase with a $ 2.9 million mortgage and a $1,326,284.50 cash loan payment from Oak Hill. According to the Complaint, Hamrick "repeatedly promised the Cotes that as soon as the Whitney Village sale closed and the sale proceeds from that transaction were transferred to the escrow account, Mr. Hamrick would return to Oak Hill the $1,326,284.50 cash payment Oak Hill made to purchase the Maine Property. Oak Hill understood from Mr. Hamrick that its out-of-pocket cash payment was a loan that would be repaid in full within a short amount of time." *Id.*

### *Whitney Village Sale*

On June 13, 2018, Oak Hill sold Whitney Village to Quinnipiac University for $7,828,639. On July 11, 2018, the SPE received $4,122,115.26 from Quinnipiac University (the remaining amount after Oak Hill's mortgage on Whitney Village was paid off).

### *Identification Period*

The Complaint alleges that Hamrick told Oak Hill that the deadline to identify replacement properties was no later than July 14, 2018 (45 days after Oak Hill closed on the Maine

Property).[3] According to Plaintiff, Hamrick provided false information about two Aspen Dental property replacement options during a meeting with the Cotes to discourage them from investing in properties that E&W would not receive a commission on. During that same meeting, Hamrick convinced Oak Hill to list two tenancy-in-common ("TIC") properties as replacement properties on the 200% Rule Identification Letter.[4]

In the 200% Rule Identification Letter, E&W identified four replacement properties on Oak Hill's behalf: (a) the Maine Property that Oak Hill had already purchased; (b) the Ohio TIC; (c) the Washington TIC; and (d) a Learning Experience property in Rhode Island. However, "[i]n violation of the Section 1031

---

[3] The Court notes that the Complaint also alleges that Hamrick incorrectly identified this date, and that the clock on the identification should have been 45 days after the relinquished property was sold. However, Defendants ask the Court to take judicial notice of IRS Rev. Proc. 2000-37, which provides that a reverse exchange timeline trigger begins with the purchase of a replacement property, not the relinquished property. Plaintiff has no response; however, the point becomes moot where according to Plaintiff's motion to dismiss, it ultimately did not rely on the date of the identification period as one of the misstatements made by Defendants.

[4] 26 C.F.R 1.1031(k)-1(c) sets out the process by which a party may identify Section 1031 exchange replacement property before the end of the identification period. 26 C.F.R. 1.1031(k)-1 ( c) (4) (i) (B) explains the 200 percent rule: "Any number of properties" may be identified as replacement properties "as long as their aggregate fair market value as of the end of the identification period does not exceed 200 percent of the aggregate market value of all the relinquished  properties as of the date the relinquished properties were transferred by the taxpayer (the '200-percent rule')."

requirements, Mr. Hamrick did not identify on the 200% Rule Identification Letter that the Ohio Property is a vacant, undeveloped lot, nor did he describe in as much detail as practical the property improvements to be completed on that lot." *See* ECF No. 1 at 15.

In the summer of 2018, Ms. O'Toole transferred a total of $564,478.87 to Oak Hill. However, Hamrick did not return the remainder of the cash loan, stating that if he transferred the remaining amount that was due and payable, it would become taxable upon receipt. Oak Hill claims that, because this was a cash loan and not received from the sale at the heart of the Section 1031 Exchange, this was false. Oak Hill further alleges that Hamrick knew this was false but made this representation so that Oak Hill would be pushed to invest without obtaining debt or a mortgage, which would allow investment in the TICs.

### Ohio TIC

Oak Hill explains in its Amended Complaint that, based on the advice of its own attorneys, it moved away from the Learning Experience Property investment. Thus, by August 2018, the only potential replacement property listed on the 200% Rule Identification Letter was the Ohio TIC. The Ohio TIC "involved purchasing interests in a commercial property located at 180 Beaver Creek Circle in Toledo, Ohio. The TIC interests were sold to investors by Rockwell Toledo, LLC and/or Rockwell Debt Free

Properties, Inc. (collectively, 'Rockwell')." Rockwell sold TIC
interests to investors throughout the country to facilitate the
creation of event venues built and operated by Noah Corporation
("Noah"). Noah then rented those event venues. According to the
Complaint, "E&W identified the investors to invest in
Rockwell/Noah TIC properties and connected those investors with
Rockwell/Noah to complete the sale. In return, E&W and/or its
officers were paid a commission off the top of the investor's
investments in Rockwell/Noah TIC properties." *See* ECF No. 1 at
17.

    The Complaint alleges that Hamrick "directly and repeatedly
extolled the Ohio TIC investment to Oak Hill in a misleading and
false manner." *See id*. at 18. On July 2, 2018, Hamrick told the
Cotes that they must make an initial investment of at least $1
million – however, he knew (or was reckless in not knowing) that
this was false, and other investors had purchased interests for
much less. Oak Hill asserts that Hamrick made this assertion to
increase his commission. In fact, Oak Hill alleges that
Hamrick's motivation for steering Oak Hill to invest in the Ohio
TIC was for O'Toole and himself to receive an undisclosed
commission of over $200,000. During that same meeting, Hamrick
told the Cotes that Noah was very successful, operated premier
event centers across the country, and never missed a rent
payment. He told them that the TIC was "super low risk" because

11

Noah was responsible for paying all property taxes, maintenance fees, and insurance premiums. The Complaint alleges that on July 25, 2018, Hamrick provided that the Ohio TIC would generate an annual income of about $250,000. According to Plaintiff, he did so while in possession of Noah and Rockwell's financials, and knew (or was reckless in not knowing) that Noah was suffering financial hardship. The Complaint alleges that "[i]f Oak Hill had known that Noah – the only tenant in the building to be constructed specifically for Noah to occupy and, thus, the only source of the return on its investment – was suffering financial hardship, it would not have purchased about $3.5 million in Ohio TIC interests." *See* ECF No. 1 at 19. Hamrick also represented that he had personally invested in Rockwell/Noah TICs given the reliability and profitability of Noah as a tenant. He also said that he "practically owned" the Noah's event venue that Rockwell sold to him in New Hampshire, though in reality he only possessed a 4% TIC interest.

Additionally, Hamrick told the Cotes that the 12,000 square foot building on the Ohio Property would be completed no later than January 2019, with Noah renting the space. Hamrick either knew or was reckless in not knowing that this was false. Rockwell purchased the Ohio Property on August 21, 2018. At that time, the property was a vacant lot and no building permit had been issued. Noah had never completed any event venue anywhere

12

in the country from the ground up in under six months. The
Complaint also asserts that Hamrick provided Oak Hill with
Rockwell's offering Memorandum for the Ohio TIC.

The Complaint asserts that the Offering Memorandum contains
several misleading points or misrepresentations, such as
photographs of an event venue that appears to be near completion
but that was not actually located on the Ohio Property.
Plaintiff asserts that Hamrick knew or was reckless in not
knowing that these representations were false. It also asserts
that the Offering Memorandum "did not disclose that Rockwell
would pay E&W nor anyone else a substantial commission based on
the amount Oak Hill invested in the TIC and that this commission
(among others) would be immediately taken off the top of Oak
Hill's investment." *See* ECF No. 1 at 22. Hamrick also arranged a
conference call on July 31, 2018, at which Rockwell's officer
and controlling principal made misrepresentations to Mr. Cote
that Hamrick heard while participating in the call but did not
correct. Statements included that Noah was a stable tenant, and
that construction of the building would be complete by January
2019 so that the transaction would qualify under the 1031
requirements.

Separately, Ms. O'Toole had a telephone conversation with
Mr. Cote about him potentially attending a Rockwell open house
at a Noah event center in New Hampshire. During the

13

conversation, "Ms. O'Toole spoke very highly of Rockwell and Noah as businesses and represented that investing in a Rockwell/Noah TIC was a great investment" while failing to disclose that she was financially incentivized through commissions. *See* ECF No. 1 at 44.

Mr. Cote made clear to Hamrick in July and August 2018 that "Oak Hill intended to sell Ohio TIC interests not long after purchasing the TIC. Oak Hill made clear that it did not want to keep its interest in the Ohio TIC long term." *See id*. at 23. Hamrick advised Oak Hill then that Ashby would be willing to enter into a buyback agreement. This was extremely important to Oak Hill, "because Oak Hill understood that purchasing the Ohio TIC interests in August 2018 and then selling that interest less than a year later at a reduced price to Rockwell made more economic sense than failing to complete the 1031 Exchange and paying capital gains tax to the IRS." *Id*. at 24. Hamrick knew, or was reckless in not knowing, that Oak Hill's intent "to park its money in the Ohio Property by purchasing and holding TIC interests in the short term may cause the IRS to invalidate the Section 1031 Exchange as not in compliance with the Section 1031 rules." *Id*.

The Complaint alleges that Hamrick represented to Oak Hill in July and August 2018 that the Construction TIC transaction in Ohio with a buyback agreement complied with Section 1031, even

14

though he knew that (1) Oak Hill would take title before the building was constructed, and (2) the building would not be constructed until after the exchange period closed. He knew or was reckless in not knowing that the Ohio TIC transaction he identified and recommended that Oak Hill purchase likely did not comply with the Section 1031 requirements. The Complaint claims that although Hamrick should have advised of the risks, he said nothing and did nothing so that he, and Ms. O'Toole, could receive approximately $200,000 as an undisclosed commission.

Oak Hill then agreed to purchase a 58.12% TIC interest in the Ohio Property for $3,554,202.60 with the intent of completing its Section 1031 exchange. Oak Hill entered a Completion Guarantee Agreement with Rockwell, as well as a Buyback Agreement. Hamrick was aware of and reviewed both. On August 30, 2018, E&W wire transferred $3,554,202.60 on behalf of Oak Hill to First American Title Insurance Company. That same day, First American Title Insurance Company wire transferred those funds to Rockwell's checking account. On August 28, 2018 (the date the Purchase and Sale Agreement was executed), Rockwell wire transferred $136,400 from its checking account to O'Toole Enterprises LLC. On August 30, 2018, Rockwell wire transferred an additional $177,500 to O'Toole Enterprises LLC. "Upon information and belief, these two payments (and perhaps other subsequent payments to O'Toole Enterprises LLC from

15

Rockwell's checking account) reflect Mr. Hamrick and Ms. O'Toole's commission on Oak Hill's Ohio TIC purchase." *See* ECF No. 1 at 27. Oak Hill did not discover these undisclosed payments until mid to late 2019.

On December 19, 2018, Oak Hill notified Hamrick that it intended to purchase an Aspen Dental and Five Star Urgent Care and wanted to sell its Ohio TIC interests to Rockwell immediately. Hamrick sent Mr. Cote an e-mail that stated: "We need to talk about this strategy, timing, etc. Selling this large of slice [of the Ohio TIC] in time for any specific close dates could be problematic unless you exersize [sic] your buyback option . . . my opinion (if you want it or not :)) . . . you are in much better shape with your Noah's holdings at 7%, 20YR absolute net lease, and 2% uplifts than with 5 Star locations . . . The underlying real estate proposition with the Noah's properties is much better than most of the urgent care locations that I've seen on their website." *Id*. at 28. The Complaint alleges that "Mr. Hamrick discouraged Oak Hill from getting out of the Ohio TIC in December 2018 even though he knew (or was reckless in not knowing) that Noah was a sinking ship and that construction of the building on the Ohio Property had barely begun." *Id*. "After unsuccessful attempts to sell its TIC interests to other investors, Oak Hill exercised its right for Rockwell to buy back all of its Ohio TIC interests on February

25, 2019. To date, Rockwell has not bought back Oak Hill's Ohio TIC interests and has not paid Oak Hill anything for those interests." *Id.*

On January 3, 2019, Ms. O'Toole (in her capacity as President and Operations Manager at E&W) sent a letter to Oak Hill providing documentation that E&W received the sum of $7,650 for consulting and QI services. She did not disclose the commission in the letter.

### Ohio TIC Fallout

Any preliminary construction work at the Ohio Property ceased by the spring of 2019, and only partially constructed exterior walls currently exist on the property. In 2019, the fair market value of the Ohio Property was approximately $630,000, and contractors have recorded about $430,000 in mechanics' liens for unpaid work. The property is in foreclosure proceedings, and taxes on it have not been paid. The Complaint states that, "[u]pon information and belief, none of the $3,554,202.60 that Oak Hill paid for its Ohio TIC interests was used by Rockwell or Noah/Gabriel Management Corporation to construct the building on the Ohio Property. Instead, it was diverted to pay undisclosed commissions, rents owed to prior investors, and the costs to construct other Rockwell/Noah buildings in the country." *Id.* at 30.

On May 28, 2019, Noah filed a Chapter 11 Voluntary Petition for bankruptcy protection in the United States District Court for the District of Utah.

***Utah Case***

On January 3, 2020, Oak Hill and several other plaintiffs filed suit against several defendants in the United States District Court for the District of Utah. Though E&W and Hamrick were both defendants to that suit, Oak Hill clarified that it was not pursuing claims against Hamrick and E&W in Utah:

> Plaintiff Oak Hill Management, Inc. is a Vermont corporation with its principal place of business in Vermont. Oak Hill Management, Inc. is currently pursuing claims against Rockwell and Ashby in a separate action. To serve the interest of judicial economy, Oak Hill Management, Inc. has elected not to assert claims against these Defendants in this case. Oak Hill Management, Inc. has further elected not to join in the claims against Defendants Edmund & Wheeler, John Hamrick and Chris Brown asserted in this case. Oak Hill Management, Inc. joins in the claims against all other Defendants, and reserves the right to amend the Complaint to add its claims against additional Defendants as circumstances may dictate.

Comp. at ¶ 58, Fucci, et. al. v. Bowser, et. al., C.A. No. 2:20- cv-00004-DBB-DAO (D. Utah filed Jan. 3, 2020). On September 2, 2020, Rockwell filed for bankruptcy and an automatic stay was issued in the case; however, on May 3, 2021, the Utah district court issued a memorandum decision and order granting a motion to vacate the state for the other properties.

### Procedural History

Oak Hill filed this lawsuit in federal court on August 27, 2020 against Defendants Edmund & Wheeler, Inc. ("E&W"), O'Toole Enterprises LLC, John D. Hamrick, and Mary O'Toole.  The initial Complaint was comprised of eleven counts. Defendants filed two separate motions to dismiss for failure to state a claim (ECF Nos. 23, 24) on December 4, 2020. The Court denied the motion to dismiss filed by E&W and Hamrick but granted the motion to dismiss by Mary O'Toole and O'Toole Enterprises.

On July 1, 2021, Oak Hill submitted its First Amended Complaint ("FAC") in which it added the three counts addressed in this order. Additionally, Oak Hill added McLane Middleton, John G. Burk & Associates and Daniel J. Antosiewicz as Defendants.

Defendants Hamrick, O'Toole, and O'Toole Enterprises LLC have now filed a partial motion to dismiss on Counts Twelve, Thirteen, and Fourteen of the FAC.

Because the Court has already dismissed the claims against Mary O'Toole and O'Toole Enterprises, it declines to exercise personal jurisdiction over Ms. O'Toole and O'Toole enterprises for the pending state law claims filed in the FAC. *See* ECF No. 55 at 50 ("Because the Court is granting dismissal on the control person federal securities claim against O'Toole, it declines to exercise pendent personal jurisdiction over the

19

state law claims arising out of a common nucleus of operative facts at this time. Nor does the Court find that the requirements of due process are met here, such that the minimum contracts test is met.[5]") *See* ECF No. 55 at 50. The Court's full analysis in declining to exercise personal jurisdiction over Mary O'Toole and O'Toole Enterprises is described in a previous order. *See id.* at 45-53. As a result, this order will only address the pending claims over Defendant Hamrick. The motion to dismiss counts Twelve, Thirteen, and Fourteen of Oak Hill's FAC is therefore granted for Mary O'Toole and O'Toole Enterprises.

## Legal Standards

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[5] The due process standard is still applicable even without the federal claim, because Vermont's long arm statue similarly does not place extra constraints on personal jurisdiction. "In the absence of a federal statue specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the court] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction[.]" *Brown v. Lockheed martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016).

(citing *Twombly,* 550 U.S. at 556). When considering a motion to dismiss, the court must accept all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## Discussion

### I.   Count Twelve

In Count Twelve of the FAC, Oak Hill alleges that the entities it employed during the 1031 transaction are licensed professionals and none of them disclosed that they would receive a commission on the Ohio TIC transaction. Oak Hill further alleges that this failure to disclose represents a breach of the duty of care owed by Defendants, and that Defendants acted as "dual agents" representing the interests of both the buyer (Oak Hill) and the seller (Rockwell) in the transaction. Oak Hill asserts that this conduct amounts to professional negligence.

Defendants counter that Count Twelve should be dismissed because Plaintiff's facts do not support the claim that Defendants were acting as real estate professionals during the exchange, and that "[t]he allegation that the Motion Defendants were acting as real estate professionals is not based on factual

allegations that would make the inference plausible." *See* 44-1 at 8. "The FAC is devoid of any actual observations or factual support that supports this claim." *Id.*

In professional negligence cases, a plaintiff must prove facts upon which the law imposes a duty of care, breach of that duty, and proximate causation of harm. *See Yager v. Clauson*, 139 A.3d 1127, 1130 (N.H. 2016). "Whether a duty exists in a particular case depends upon what risks, if any, are reasonably foreseeable." *Goodwin v. James*, 595 A.2d 504, 507 (N.H. 1991). Under New Hampshire law, licensed sellers, brokers and facilitators practice unprofessional conduct by "[a]ccepting, taking or charging an undisclosed commission" and/or "[k]nowingly committing, or being a party to any material fraud, misrepresentation, concealment..." *See* N.H. RSA § 331-A:26, XIII, V.

For the reasons set forth above, the Court declines to exercise personal jurisdiction over Mary O'Toole and O'Toole Enterprises. However, in regards to John Hamrick, the Complaint is full of facts that suggest Hamrick engaged in misleading behavior, *see* ECF No. 55 (the Court denying Hamrick's motion to dismiss the original Complaint), which on its face satisfies the requirement that a complaint provides "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegality." *See Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 346

(E.D.N.Y. 2019) (citing *Arista Recs.*, *LLC v. Doe 3*, 604 F.3d
110, 120 (2d Cir. 2010)).

First, Hamrick allegedly failed to disclose his financial
interest in the transaction. Oak Hill points to the fact that
Defendants received two payments following the transaction, both
of which were not disclosed. Plaintiff further alleges that
Hamrick had been hired to serve as a QI, a role which precluded
him from acting as a broker or an interested party. Despite that
role, according to the Complaint, Hamrick "directly and
repeatedly extolled the Ohio TIC investment to Oak Hill in a
misleading and false manner." Plaintiff specifically outlines
that Hamrick made a series of misrepresentations throughout
their interactions including that the minimum floor for the
investment in the Ohio TIC was $1,000,000.00; that Noah had
never missed a rent payment and that the Ohio TIC was a low risk
investment; that the building on the Ohio property would be
completed no later than January 2019; that he "practically
owned" Noah's Bedford event venue; and an omission: that he was
receiving a commission on the sale.

Defendants offer that the "only plausible inference in
light of all the other facts plead for the reasons that the
Motion Defendants 'fail[ed] to disclose to Oak Hill their
involvement in the real estate transaction' is that there was no
'involvement.'" *See* ECF No. 44-1 at 9. Defendants merely

alleging that they were not involved is not a sufficient argument to grant a motion to dismiss. Furthermore, just because Defendants were not permitted to behave as brokers in the transaction does not mean that they did not do so. Taking Plaintiff's facts as true, which the Court must do in its review of a motion to dismiss, Hamrick could be found to be covered by the state's licensed professional guidelines and could be found to have violated those guidelines both by accepting an undisclosed commission and by giving misleading information to Plaintiff. Plaintiff argues that Hamrick's conduct fell below the applicable standard of care governing real estate professionals in the state of New Hampshire, and, at this state of the litigation, the Court finds that this is a plausible claim. **Hamrick's motion to dismiss on Count Twelve is therefore denied.**

## II.  Count Thirteen

Plaintiff alleges that Mr. Hamrick and Ms. O'Toole converted funds from Plaintiff's purchase of the Ohio property and converted those funds for their own use. Specifically, Plaintiff alleges that Hamrick and O'Toole transferred two payments, one for $136,400 and the other for $177,500 from Rockwell to O'Toole Enterprises following the Ohio property transaction, and that these payments represent the "secret commission that . . .

[Defendants] wrongfully and intentionally skimmed off the top of Oak Hill's Ohio TIC purchase." *See* ECF No. 37 at 62.

Defendants argue that Oak Hill has not made a plausible claim for conversion because "'Funds' are not traditionally considered property that can be converted; . . . [and] Oak Hill never had a 'right' to the specific money it claims was coveted." *See* ECF No. 44-1 at 10. Therefore, the Court will address two questions; 1) whether the loss or transfer of funds constitutes converted property and 2) if yes, whether Plaintiff has made a plausible claim for conversion against Hamrick in this case.

In Vermont, "[t]o establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *See Montgomery v. Devoid,* 915 A.2d 270, 275 (Vt. 2006) (citing *P.F. Jurgs & Co. v. O'Brien*, 629 A.2d 325, 328 (Vt. 1993)). "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another." *See O'Brien*, 629 A.2d at 329; *see also Moulton v. Bane*, No. 14-CV-265-JD, 2014 WL 6671896, at *2 (D.N.H. Nov. 24, 2014) (outlining the elements of a conversion claim).

As to the first question, the Court finds that funds can be considered converted property. While conversion claims have historically involved tangible physical property, *see Montgomery*, 915 A.2d at 275 (citing Black's Law Dictionary 251 (8th ed. 2004)), courts have expanded those claims to include money. *See id*. n.1 ("Today it may be said that 'when the defendant commits an affirmative act and physically takes control of particular paper monies he is guilty of conversion, even if the particular bills or coins cannot be identified.'"). "Because of its historical roots, the tort of conversion traditionally applied only to tangible goods, but has since expanded to include intangibles merged in documents such as bonds, stock certificates, bills of exchange . . . ." *See id*. (citing *Lyon v. Bennington College Corp.,* 400 A.2d 1010, 1012 (Vt. 1979)). Given the development of this history, the Court finds that conversion can in fact apply to funds.

As to the second question, whether Plaintiff has made a plausible conversion claim, the Court also finds in the affirmative.  In assessing conversion claims, Vermont courts have relied on the Restatement of Torts (Second), which considers several factors in conversion claims including:

> a)the extent and duration of the actor's exercise of dominion or control; b) the actor's intent to assert a right in fact inconsistent with the other's right of control; c) the actor's good faith; d) the extent and duration of the resulting interference with the other's

> right of control; e) the harm done to the chattel; and
> f) the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A (2); *see also Montgomery*, 915 A.2d at 276. Here, taking the facts in the Complaint as true and applying those facts to the forementioned factors, Oak Hill has made a plausible conversion claim.

First, Defendants Hamrick, O'Toole, and O'Toole Enterprises had taken full control of the money. The funds had been transferred by Oak Hill to Rockwell and Rockwell promptly sent a portion of that payment to Defendants. Therefore, one could conclude that Defendants had exercised complete control over the funds upon deposit in their account. *See Montgomery*, 915 A.2d at 276 (noting that defendants had "exercised total but fleeting control over the money when they accepted it . . . and deposited it into their accounts"). In *Montgomery*, the court found that although defendants had "complete control over the money while it was in their accounts, they never considered the money their own or acted as if they did." *See id.* That is not the case here. Defendants made no indication that they did not consider the money their own. Rockwell transferred the two payments to O'Toole Enterprises which is managed and run by Hamrick and O'Toole. There is no reason to believe that they did not consider the money to be their own.

The second factor, the intent to assert a right in fact inconsistent with the other's right of control, flows naturally from the first factor. Because the Court has already concluded that Defendants exercised full control of the money, and that there is no reason to think that they did not view the money as their own, the Court also finds that the Defendants intended to treat the money as their own and assert a right inconsistent with the other's right of control. Thus, the second factor also supports Plaintiff's conversion claim.

The third factor addresses the actor's good faith. Accepting the facts in the Complaint as true, Defendants knew that the funds belonged to Oak Hill and that Defendants had not properly disclosed that the money would be allocated to them. While this factor is not dispositive, an actor's intent is something to be considered. *See Montgomery*, 915 A.3d at 277 ("[O]ne may be liable for conversion even absent knowledge that the property belongs to another; nevertheless, the good faith of the defendant . . . may be a factor in determining whether liability for conversion is appropriate."). Here, again, accepting the facts in the Complaint as true, Defendants were aware that the funds belonged to Oak Hill and that they had not disclosed that it would receive some of those funds. This factor also weighs in favor of Plaintiff's conversion claim.

The fourth factor refers to the extent and duration of the resulting interference with Plaintiff's right of control. Oak Hill alleges that Defendants engaged in misleading and fraudulent activity to get Plaintiff to buy the Ohio TIC, all so that Defendants would receive an undisclosed commission. Given that Defendants had not disclosed their interest in the transaction, the Court can conclude that the extent and duration of the interference was permanent.

Finally, factors five, the harm done to the chattel, and six, the inconvenience and expense caused to the other, also weigh in favor of Plaintiff alleging a plausible conversion claim. In its Complaint, Oak Hill has plead facts conveying that harm was caused and the expense incurred, including alleging that it would not have invested in the Ohio property but for Defendants' misleading statements or if it had it known about Defendants' interest in the property, and that as a result it lost the totality of its initial investment.

Therefore, all six factors support Plaintiff's conversion claim. The Court therefore joins another court in finding that the facts in this case, taken as true, support a conversion claim. *See DiTucci v. Ashby*, No. 2:19-CV-277-TC-PMW, 2020 WL 1249627 at *9 (D. Utah Mar. 16, 2020)("The complaint specifically states that the E&W Defendants secretly skimmed off a portion of Plaintiff's investment to pay themselves a

commission. If, as alleged, the E&W Defendants were redirecting part of Plaintiffs' funds for themselves, then the E&W may be liable for conversion."). **Hamrick's motion to dismiss on Claim Thirteen is therefore denied.**

### III. Count Fourteen

The Vermont Consumer Protection Act ("VCPA") provides a state cause of action for consumers injured by "unfair" or "deceptive" acts. Oak Hill alleges that Defendants misrepresented facts in the Ohio TIC transaction. Specifically, Plaintiff alleges Defendants omitted that they would receive a commission from the transaction and that they would not have purchased the property had Mr. Hamrick and Ms. O'Toole disclosed their involvement.

The VCPA prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce," and provides a right of action to "consumers" who show "either (1) reliance on a deceptive act in contracting for goods and services or (2) damages or injury from an unfair or deceptive act." *See* Vt. Stat. Ann. tit. 9, § 2453(a) (1993); *Dernier v. Mortgage Network, Inc*. 87 A.3d 465, 481 (Vt. 2013).

Defendants argue first that Oak Hill is not a "consumer" under the VCPA, as it was not purchasing "goods or services in commerce." ECF No. 44-1 at 11. Defendants argue that this transaction instead is best described as "'private negotiations

between two individual parties who have countervailing rights and liabilities established under common law principles of contract, tort and property law' [which] remain beyond the purview of the statue." *Foti Fuels, Inc. v. Kurle Corp.*, 90 A.3d 885, 893 (Vt. 2013). Defendants next argue that its negotiations with Oak Hill reflect a "high level of customization . . . achieved through particularly negotiated contract terms" and as a result there is no indication that the services being offered were for "general consumption." *See* ECF No. 44-1 at 12.

The Court is unpersuaded by both of Defendants' points and finds that Plaintiff's VCPA claim should not be dismissed. Under the VCPA, a "consumer" is considered "any person who purchases or otherwise agrees to pay for goods or services" or "a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade of business or in connection with the operation of his or her business." *See* 9 V.S.A. § 2451a (1); *MyWebGrocer, Inc. v. Adlife Mktg. & Commc'ns Co.,* 383 F. Supp. 3d 307, 311 (D. Vt. 2019). That is exactly what Oak Hill did in this transaction. Oak Hill secured Hamrick's services for 1031 consulting. It signed a contract and agreed to pay money in exchange for a service. As a result, Oak Hill behaved as a consumer in this context.

Next, the Court is not convinced that the agreement between Hamrick and Plaintiff was so customized as to transcend general consumption. Hamrick and E&W held themselves out as a consulting firm, and as 1031 experts. Specifically, the Complaint alleges that "E&W purports to be one of the nation's premier 1031 Exchange consulting firms, with over 35 years of experience." *See* ECF No. 1 at 8. The Complaint further alleges that when Oak Hill hired the firm, which is run by Hamrick, E&W's website indicated that it was "insured & bonded" and that over the years the firm had "never lost a dime of [its] client's hard earned money, or ha[d] any type of claim against [its] insurance coverage." *Id.* This suggests that E&W held itself out to the public for general consumption. It contradicts the claim that this agreement was a result of specialized, private negotiations, but rather suggests that Plaintiff entered into an agreement that many different parties could have entered. **Hamrick's motion to dismiss on Claim Fourteen is therefore denied.**

## Conclusion

For the reasons set forth above, the motion to dismiss (ECF No. 44) is granted for Defendant Mary O'Toole and O'Toole Enterprises and denied for Defendant John Hamrick.

    DATED at Burlington, in the District of Vermont, this 16th
day of March, 2022.


                              /s/ William K. Sessions III
                              William K. Sessions III
                              U.S. District Court Judge